No. 18,957.

HERMAN A. FLADER, ET AL. v. KENNETH N. SIMONSEN.
(366 P. [2d] 678)

Decided November 27, 1961.   Rehearing denied December 18, 1961.

Mr. LOWELL WHITE, Mr. WALTER A. STEELE, for plaintiffs in error.

Messrs. LESHER, SCHMIDT and VAN CISE, for defendant in error.

*En Banc.*

MR. CHIEF JUSTICE HALL delivered the opinion of the Court.

THE parties appear here in reverse order to their appearance in the trial court. We will refer to them as plaintiff and defendants, or by name.

Simonsen procured a judgment against defendants for some $80,000.00 for personal injuries suffered by him as the result of the crash of an airplane owned by Flader Industries, Inc., and piloted by Flader, in which Simonsen was a nonpaying passenger.

Defendants are here by writ of error seeking reversal and dismissal of Simonsen's complaint. Their only contention here is that the trial court should have sustained their motion for a directed verdict at the close of plaintiff's testimony, and again at the close of all of the testimony, and thereafter by motion for judgment of dismissal notwithstanding the verdict.

In his complaint and in the trial of the case Simonsen relied upon three alleged acts of negligence: (1) taking off by Flader with knowledge that the plane was in unsafe condition; (2) taking off in high pitch; (3) failure to use due care in landing the plane after the engine had failed.

On October 4, 1955, the date of the accident, Flader Industries, Inc. (Flader was the president and "head" of the corporation) was the owner of a Beechcraft Bonanza, single engine (Continental) four-passenger airplane. The company had purchased the plane in 1948 and it was used for company purposes and was being so

used at the time of the accident resulting in Simonsen's injuries.

Flader, age seventy, was a mechanical engineer thoroughly acquainted with gasoline engines. In 1946, after completion of a course of instructions in flying approved by the Civil Aeronautics Authority, he was granted a private pilot's license by CAA and thereafter continued to fly as a private pilot.

From 1946 to 1954 defendants owned the Adams City Airport and during that period conducted at said airport a flying school of instruction conforming to CAA requirements and approved by CAA.

In the spring of 1954 defendants disposed of the Adams City Airport and discontinued the flying school.

During the period from the spring of 1954 until July of 1955, the plane was kept outdoors at the Sky Ranch Airport.

In July 1955, Flader took the plane to the Englewood Airport and then and there requested that the airplane be given what is called the 100-hour and annual inspection, that all necessary adjustments, repairs, etc. be performed so that it could be certified as airworthy and re-licensed.

One Riley Cass, lessee and operator of the Englewood Airport Shop, with an "A & E" rating (meaning that he has passed the examination for aircraft and engine mechanics prescribed by the CAA), conducted all of the tests and inspections and did all of the work by him deemed necessary or advisable to put the airplane in perfect operating condition and, on August 8, 1955, he issued his "Certificate of Airworthiness" prescribed by CAA, showing the craft to be airworthy. Flader paid the charges for the inspection work, parts and licensing in the amount of $231.74.

On August 13, 1955, Flader, then an experienced and licensed private pilot, having logged over 2000 hours in the air, flew the plane from the Englewood Airport to Sidney, Nebraska, and return — a distance of about 320

miles consuming about three hours' time in the air. On the return trip Flader noticed that the engine was running "rough," that the air speed indicator was not functioning properly and that the left magneto was missing some. On landing he notified Cass of these matters and requested that they be corrected. Thereupon Cass replaced the air speed indicator, installed a set of new magneto points, put in a new condenser and gasket, thus correcting the matters of which Flader complained.

During the period from August 13, 1955, until October 4, 1955, the plane remained at the Englewood Airport. Cass retained the keys and during that period it had not been used in any manner.

Simonsen contacted Flader on October 3, 1955, and was informed by Flader that he was going to fly to Nebraska the following day. Simonsen asked if he might go along and Flader stated that he could. That same day Flader called Cass and told him of his intended trip. Cass told Flader everything was in perfect shape.

On the morning of October 4, 1955, Flader picked Simonsen up at his home and drove to the airport. There Flader obtained the plane keys from Cass, who then assured him that the plane was in good operating condition. Flader and Simonsen got into the plane, Flader started the engine and the plane was taxied to the gas pump. Cass filled the tank with twenty-six gallons of gas. The oil gauge showed the oil to be six quarts low and this amount of oil was added.

Flader checked all of the instruments, gauges, high and low pitch, left and right magnetos, and functions of the craft and, according to his undisputed testimony, "everything showed perfect." He then taxied to the north end of the 4800 foot north-south runway, warmed up the engine for about ten minutes, and then took off to the south. The plane became airborne after proceeding about 2500 feet on the runway.

Flader retracted the wheels and had reached a point about 300 feet beyond the end of the runway and was

about 100 or 125 feet above the ground when the engine sputtered and quit. Flader immediately worked a hand pump designed to force gas to the carburetor, but the engine remained dead. He looked for a place to land and made a belly landing in a comparatively level plowed field to the left of the end of the runway. The plane landed hard and bounced forward in a sort of semicircle to the left and came to rest on its belly. Simonsen and Flader were both seriously injured.

We shall discuss the evidence as disclosed by the record with reference to the three alleged acts of negligence.

First, with reference to the charge that the plane was in an unsafe operating condition and that Flader knew or should have known of this condition:

We fail to find any evidence in the record tending to establish this allegation. Flader had the plane checked on August 8th by an expert CAA licensed aircraft and engine mechanic. He had an official CAA certificate wherein it is certified that every detail of the plane had been checked and found to be or had been put in good operating condition and that the plane was airworthy. He had flown the plane to Nebraska and return without incident. On that trip he had observed three minor matters to be corrected. He had these corrected by the same expert who, immediately prior to take-off, assured him that "the engine worked perfectly."

Counsel for Simonsen contend that there was known engine trouble before the take-off in that it was necessary to add six quarts of oil to make the oil gauge show full, and that this fact was "a red flag to anyone exercising the care and caution of a reasonably prudent man."

There was no proof that the engine burned excessive oil. In addition, even if six quarts were consumed on this three hour trip, all of the witnesses agreed that this particular engine is so made that if allowed to remain idle the oil in the tank may seep down into a so-called sump. In such event the oil gauge might show low even though the engine contained the proper amount of oil.

In event of such seepage and after the engine is started the oil gets out of the sump and into the circulation system of the engine. If oil is added when there is no shortage but a shortage appears on the oil gauge, then after the engine has run for a short time the surplus escapes by means of an overflow device.

All of the expert witnesses (Simonsen's and Flader's) agree that the burning of an excessive amount of oil could not be a cause of engine failure when the tank had been refilled. So, whether the engine burned an excessive amount of oil on the Nebraska trip is wholly immaterial insofar as motor failure is concerned.

There is no evidence in the record before us that even tends to establish the charge that "prior to take-off defendants knew or should have known that said airplane was in unsafe operating condition." All of the testimony is to the effect that the airplane was in perfect operating condition and that Flader had been so advised and had so observed.

Taking up now the second charge: that Flader was negligent in taking off in "high pitch" whereas due care dictated that he take off in "low pitch." Flader testified positively that he took off in low pitch. The evidence is positive and uncontradicted that after the landing the plane was still in low pitch.

Several witnesses testified that the plane could not be taken off the ground at this altitude in high pitch. The only evidence tending to prove that the take-off was in high pitch comes from two witnesses for Simonsen, who heard the plane take off, *thought* that it sounded like high pitch. One of them observed the engine after the crash and testified that the engine was then in full high pitch *or* full low pitch. There were only two possibilities, high or low, and he confined himself to stating that it was one or the other. Such testimony has no probative value.

We need not determine whether such testimony was sufficient to create an issue of fact to be resolved by

the jury. This, for the reason that all of the testimony is to the effect that it is up to the pilot to decide whether to take off in high or low pitch. Some prefer a fast take-off, others slow. The fact remains that the plane, without incident, took off and became airborne when reaching a point about half way down the runway, and it continued with the engine functioning properly to a point about 300 feet beyond the end of the runway. There is no testimony that the manner or means of accomplishing a successful take-off could have anything whatsoever to do with a subsequent engine failure.

Turning now to the third point of alleged negligence — failure of Flader to exercise due care in seeking to land the plane after the engine failure.

The evidence is clear and uncontradicted that at the moment of engine failure the plane was headed south at a point some 300 feet beyond the south end of the runway and was then about 100 to 125 feet in the air. It is conceded that at the moment of engine failure Flader, because of lack of altitude, could not make it back to the airport; likewise conceded that the terrain to the west was rough and unsuitable for landing. Consequently Flader was confronted with a straight-ahead landing or turning left to the east.

Directly in front of Flader was rough, uneven ground, sloping slightly to the south. About 1500 feet to the south was a depression variously described as a "ravine," "an intermittent stream," "an arroya," "a gully," "a sand draw." Immediately to the east was a newly planted, rectangular shaped field about 470 feet north and south by about 1500 feet east and west; it was smooth and sloped gently to the east.

All of the witnesses, including Flader, agree that on engine failure with single engine craft at a low altitude, where the surrounding terrain is equally suitable for a forced landing, that proper procedure calls for a straight-ahead landing. Such a landing permits of a longer glide

without loss of air speed and also minimizes the chances of a stall and loss of control of the plane.

All of the witnesses, including plaintiffs' experts, agree that the cultivated field to the left afforded the best terrain for landing. Thus Flader was confronted with the choice of (1) a straight-ahead landing with the advantages of longer glide and less danger of losing control, but with the hazards attendant to landing on unsuitable terrain, or (2) making a left turn with a shorter glide, some loss of air speed, and the added danger of loss of control on making the turn, but with the advantages of suitable landing terrain if he were able to negotiate the turn, keep control and make a belly landing on smooth ground.

Flader was in the air, he had a good view of the area, and chose the field to his left as the place to land. In his words, on cross-examination on why he did not go straight ahead, he stated:

"If I wanted to get killed I could have gone straight ahead, * * *."

"If my plane hit that [the straight-ahead gully] I would have turned over and burned alive."

"* * * the engine quit * * * and I looked around and I saw this sand draw and gully in front of me, and I looked to the left and I saw this big spot that was flat, the flatest spot in that whole neighborhood, I picked that out. And that is the only reason I am here today, if I didn't pick that I wouldn't be here."

Flader made the left turn. He retained sufficient air speed to glide some 1300 feet, about the same distance Simonsen's witnesses estimated he might have glided in a straight-ahead landing; he did make a belly landing and the plane came to rest on its belly. All of the witnesses agreed that to keep control of the plane, not let it fall, and make a belly landing is all that can be hoped for in the event of engine failure at low altitude.

Flader accomplished all of this, and we find no evi-

dence which tends to establish lack of due care by Flader in making the emergency landing.

Defendants' motion for a directed verdict in their behalf should have been sustained.

Here, for the first time, counsel for Simonsen seek to invoke the doctrine of res ipsa loquitur. Throughout the trial Simonsen took the position that he well knew what caused the crash. He relied upon specific acts of negligence and undertook to prove the same.

The trial judge had all of the testimony before him and made no finding that the facts were such as to warrant invoking the doctrine; no request was made that such a finding be made; no request was made for instructions with reference to the doctrine. Such being the state of the record before us we find no merit in counsels' present contention.

The judgment is reversed and the cause remanded with directions to dismiss the complaint.

MR. JUSTICE MCWILLIAMS and MR. JUSTICE PRINGLE not participating.